UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| SUSANNE EDGMON, ) | 3:07-cv-154 JWS |
| ) | (Lead Case) |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| CONSOLIDATED WITH ) | |
| ) | 3:08-cv-035 JWS |
| GARRETT EDGMON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Federal Tort Claims Act medical malpractice action was tried to the court from May 3 through May 6, 2010. In its Answer to the Complaint, the United States admitted that the Kanakanak Hospital in Dillingham, Alaska, and the health care providers there are federal employees for purposes of the Federal Tort Claims Act.

Pursuant to Federal Rule of Civil Procedure 52, the court sets out is findings of fact and conclusions of law below.

**FINDINGS OF FACT**

Ms. Edgmon suffered from epithelial ovarian cancer; but, during the trial most of the testimony and the lawyers' arguments used the shorter term "ovarian cancer." The court will use the shorter term in this order as well.

The parties stipulated to and the court relies on the following facts which are taken from docket 67 in the Lead Case, with the correction of a typographical error which changes references to "defendant's Exhibit B" in the stipulated facts to read "defendant's Exhibit A."

1. Plaintiff Susanne Edgmon was born on September 7, 1960, and is currently 49 years old. During 1998 to January 2003, plaintiff resided in Dillingham, Alaska. She is married to Garrett Edgmon.

2. From December 1, 2001, to January 7, 2003, plaintiff presented to the Kanakanak Hospital on various dates. Plaintiff's visits to the Kanakanak Hospital are reflected in the medical records in defendant's Exhibit A and plaintiff's Exhibit 1003.

3. On January 7, 2003, plaintiff was referred from Dillingham to Anchorage for cancer evaluation and treatment. On January 8, 2003, plaintiff was admitted to Providence Alaska Medical Center (PAMC). On January 12, 2003, plaintiff was discharged from PAMC with a diagnosis of Stage IIIB ovarian cancer. Plaintiff's admission to PAMC is reflected in the medical records in defendant's Exhibit A and plaintiff's Exhibit 1005.

4. On January 30, 2003, plaintiff had surgery for her ovarian cancer preformed by Dr. Matthew Boente at Fairview-University Medical Center (FUMC) in Minneapolis, Minnesota. Plaintiff's admission to FUMC and her surgery and medical treatment are reflected in the medical records in defendant's Exhibit A and plaintiff's Exhibit 1013.

5. Following her cancer surgery, between 2003 and 2009, plaintiff received various follow-up care for her ovarian cancer, including chemotherapy and radiation therapy.

6. From approximately June 2003 to the present, plaintiff has primarily lived in Anchorage, Alaska.

The court makes the following additional findings of fact based on those portions of the trial testimony the court found credible and the exhibits admitted in evidence.

7. During Ms. Edgmon's January 2003 hospitalization at Providence Hospital in Anchorage, Alaska ("Providence"), her sisters came from Minnesota to assist her.

8. Ms. Edgmon decided to seek further care in Minnesota where she would have the support of her sisters.

9. Ms. Edgmon initially sought care at the Mayo Clinic in Rochester, Minnesota, but was denied care because she lacked insurance coverage. Ms. Edgmon was accepted for care at the Fairview University Medical Center ("Fairveiw") in Minneapolis, Minnesota.

10. At Fairview, Ms. Edgmon was treated by Mathew Boente, M.D., a gynecologic-oncologist with an impressive *curriculum vitae* who has performed surgery on women suffering from ovarian cancer hundreds of time.

11. Like others who specialize in gynecologic-oncology, Dr. Boente not only performs gynecologic cancer surgery, but also prescribes the course of chemotherapy which follows surgery, as was the situation in Ms. Edgmon's case.

12. Dr. Boente performed surgery on Ms. Edgmon on January 30, 2003. The surgery confirmed the diagnosis of ovarian cancer and disclosed such a large dispersion of cancerous tissues that it was necessary to remove the ovaries, the omentum, the spleen, and a portion of the sigmoid colon. Dr. Boente described the surgery as more extensive than the surgery in most of his ovarian cancer cases.

13. Stage 3 ovarian cancer is divided into subcategories A, B, and C, with C being the most serious. The extent of the cancer within Ms. Edgmon's peritoneal cavity placed her in Stage 3 C. Because her cancer had not spread beyond the peritoneal cavity, it was not Stage 4 ovarian cancer.

14. Ms. Edgmon was hospitalized at Fairview for ten days. This was longer than the typical stay of 3 to 4 days due to slowness in recovery of bowel function.

15. The goal of ovarian cancer surgery is to remove as much of the cancerous tissue as possible which improves the efficacy of subsequent chemotherapy.

16. Ms. Edgmon has undergone extensive post-surgical chemotherapy.

17. Only about 20 to 25 percent of women diagnosed with Stage 3 ovarian cancer survive for 5 years post surgery. At the time of trial, Ms. Edgmon had survived more than 7 years.

18. Ovarian cancer typically arises in the ovaries (although it sometimes appears in the ovaries as a result of metastasis). Ovarian cancer spreads through exfoliation–basically shedding cancer cells which then proliferate elsewhere in the

peritoneal cavity. This cancerous tissue is "sticky" and binds to and invades other organs, including the bowel and spleen. Among the possible consequences of the exfoliation is proliferation of cancer cells on the bowel. This may reduce the motility of the bowel resulting in bowel obstruction.

19. All experts who testified agreed that ovarian cancer is very difficult to diagnose. About 75 to 80 percent of women who are diagnosed with ovarian cancer are not diagnosed until they are already in Stage 3 or Stage 4.

20. Dr. Benny Gavi, plaintiff's expert, testified about the symptoms of ovarian cancer. To the extent Dr. Gavi's testimony about symptoms associated with ovarian cancer conflicted with the testimony of Dr. Sheryl Saene and Dr. Philip DiSaia, defendant's experts, the court found the defense experts' testimony much more convincing. Dr. Gavi is an internist with excellent credentials in internal medicine, but no specialized training in oncology. Dr. Gavi could not recall diagnosing a case of ovarian cancer, although on occasion he has ruled out ovarian cancer when making another diagnosis. Dr. Saens and Dr. DiSaia are both gynecologic-oncologists. Each has impressive credentials relating to, and very considerable experience in the diagnosis and treatment of, ovarian cancer. Each has conducted research about and published materials relating to ovarian cancer.

21. Dr. Gavi testified that lower back pain and weight loss are symptoms of ovarian cancer. The court does not accept that opinion testimony. Rather, the court accepts the opinions of the defense experts that lower back pain is not an indicator for ovarian cancer and that weight gain, not weight loss, is more likely to be associated with ovarian cancer. Symptoms of ovarian cancer include abdominal, uterine, and pelvic

-5-

pain, abdominal distension (due to excessive fluid accumulation), an eating abnormality displayed in a premature feeling of satiety, and feelings of urinary urgency or frequency. To be significant for diagnostic purposes, symptoms must be persistent and recurring with frequency, but not chronic. Thus, a symptom that is new for a particular patient and that occurred more than a dozen times in a one-month period would be significant. A diagnosis of bowel obstruction may also be indicative of ovarian cancer because it is suggestive of the possibility that exfoliated cancer cells have adhered to the bowel causing the obstruction.

22. All experts who testified agreed, and the court finds, that having family members' with histories of ovarian cancer and breast cancer places a woman at a higher than normal risk for the development of ovarian cancer. Ms. Edgmon's family history of ovarian cancer and breast cancer placed her in the higher risk category.

23. According to the medical records, Ms. Edgmon disclosed a family history of breast cancer in her mother, maternal grandmother, and maternal aunt during a visit to Kanakanak Hospital on March 28, 2001. At that time Ms. Edgmon presented with concerns about a lump on her breast. She was seen by Dr. Terry Elliott, an employee of Kanakanak Hospital.

24. According to the medical records, Ms. Edgmon again disclosed a family history of cancer which included breast cancer in her mother, and ovarian cancer in her maternal grandmother and maternal aunt during a visit to Kanakanak Hospital on December 19, 2001. At that time, Ms. Edgmon appeared for an appointment for a check up. She was seen by Dr. Elliott on that occasion as well.

25. Ms. Edgmon testified that she told the doctor during the December 19, 2001, visit that her mother had ovarian cancer, not breast cancer. Given that both the records from March 28, 2001 and December 19, 2001, state that the mother had breast cancer, and that the reason for the March visit was Ms. Edgmon's concern about a lump in her breast, the court concludes that Ms. Edgmon more likely than not stated her mother had breast cancer. Nevertheless, the history disclosed on December 19, 2001, clearly disclosed a family history of both breast cancer and ovarian cancer.

26. For a woman who has a family history of breast and ovarian cancer, the applicable standard of medical care called for an annual examination to include (1) a pelvic exam, (2) a Ca-125 blood test, and (3) a pelvic ultrasound.

27. The equipment necessary for conducting a pelvic ultrasound was available at Kanakanak Hospital. None of the doctors at Kanakanak Hospital who saw Ms. Edgmon prescribed an annual examination which included a pelvic exam, a Ca-125 blood test, and a pelvic ultrasound.

28. Administration of the appropriate annual medical exam does not assure detection of ovarian cancer. Women later diagnosed with ovarian cancer have passed the appropriate annual exam within several weeks to a few months prior to being diagnosed with ovarian cancer. Ovarian cancer can develop very rapidly from an undetectable state to Stage 3 cancer. Even though an appropriate annual exam often does not detect ovarian cancer, such an annual examination is appropriate for women with an elevated risk due to family history.

29. It was a violation of the applicable medical standard of care not to perform the appropriate annual medical examination to include a pelvic exam, Ca-125 blood

test, and pelvic ultrasound when Ms. Edgmon appeared for a check up at Kanakanak Hospital on December 19, 2001.

30. The testimony of Dr. Saens and Dr. DiSaia convinces the court that if Ms. Edgmon had ovarian cancer in December of 2001, it would not have been detected even if the appropriate exam had been given at that time.

31. Had Ms. Edgmon received the appropriate annual medical examination on December 19, 2001, her next exam would have been due around December 19, 2002.

32. Ms. Edgmon did not present at Kanakanak Hospital with symptoms suggestive of ovarian cancer until her visit on January 7, 2003.

33. Given her diagnosis of ovarian cancer in January of 2003, when Ms. Edgmon presented at Kanakanak Hospital on October 4, 2002, she probably already had ovarian cancer.

34. Given Ms. Edgmon's family history and given the fact that she had not been given an appropriate annual medical exam in December of 2001 or thereafter, it was a violation of the standard of care not to perform the appropriate medical exam in connection with her visit on October 4, 2002–either on that day or on a directed follow-up appointment.

35. Had Ms. Edgmon been subject to a pelvic exam, Ca-125 blood test, and pelvic ultrasound in October of 2003, she might have been diagnosed with ovarian cancer, but plaintiffs have failed to prove by a preponderance of the evidence that the diagnosis more likely than not would have been made at that time if there had been a pelvic exam, a C-125 blood test, and a pelvic ultrasound.

-8-

Case 3:07-cv-00154-JWS   Document 86   Filed 05/14/10   Page 8 of 10

36. Dr. Gavi opined that a CT scan administered in October would likely have disclosed a mass which would lead to diagnosis of the cancer. Based on the medical records, Dr. Gavi also opined that a CT scan was indicated. However, the court finds Dr. Saens' opinion more convincing and accepts her opinion. Dr. Saens indicated that the substantial improvement in Ms. Edgmon's symptoms obtained by administration of intravenous fluid on October 4 indicated no testing beyond follow up X-rays to check on the bowel obstruction noted on the October 4 films. The October 7 X-rays showed resolution of the bowel obstruction. The court finds that a CT scan was not indicated in October.

37. Even if a CT scan had been recommended to Ms. Edgmon in October, the equipment needed to perform a CT scan was not available at Kanakanak Hospital. Ms. Edgmon would have been required to travel to Anchorage for a CT scan. Whether, and if so when, Ms. Edgmon would have traveled to Anchorage for a CT scan cannot be reliably ascertained from the evidence.

## CONCLUSIONS OF LAW

1. The substantive law which applies to this dispute is the law of the State of Alaska where the events took place. *See* 28 U.S.C. § 2674 (United States liable in same manner and to same extent as private litigant in same circumstances).

2. Under Alaska law, to recover damages on a medical malpractice claim, a plaintiff must prove by a preponderance of evidence the applicable standard of care, a breach of the standard of care, and damages caused by the breach. AS 09.55.540.

3. Plaintiffs have proved by a preponderance of the evidence that the applicable standard of care required an annual examination to include a pelvic exam, a Ca-125 blood test, and a pelvic ultrasound.

4. Plaintiffs have also proved by a preponderance of the evidence that defendant breached the standard of care in October 2002, when an appropriate examination was not provided.

5. Plaintiffs have not proved by a preponderance of the evidence that defendant's breach of the standard of care caused damages to either plaintiff.

6. The Clerk of Court is directed to enter judgment for defendant.

DATED at Anchorage, Alaska, this 13th day of May 2010.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE